UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

WAYNE NICOLAISON,                                    Civil No. 04-617 (RHK/JSM)

       Plaintiff,

   v.

                                         REPORT AND
KEVIN GOODNO, and                                   RECOMMENDATION
JERRY ZIMMERMAN,

       Defendants.

The above matter is before the undersigned United States Magistrate Judge on plaintiff's Motion for Judgment [Docket No. 18]; defendants' Motion for Summary Judgment [Docket No. 22]; and plaintiff's Motion to Deny Defendants' Motion for Summary Judgment [Docket No. 32].[1]

This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c). For the reasons discussed below, it is recommended that:

    1.     Plaintiff's Motion for Judgment [Docket No. 18] be **DENIED**;

    2.     Defendants' Motion for Summary Judgment [Docket No. 22] be **GRANTED**;

    3.     Plaintiff's Motion to Deny Defendants' Motion for Summary Judgment [Docket No. 32] be **DENIED**; and

---

[1]    Plaintiff's Motion to Strike Defendant's Letter [Docket No. 39] is addressed by a separate Order from this Court.

Nicholaison R&Rv4

4.      Plaintiff's Complaint be dismissed with prejudice, except for independent state law claims contained within the Complaint, which should be dismissed without prejudice.[2]

## PROCEDURAL AND FACTUAL BACKGROUND

### I.      General Background

Plaintiff Wayne Nicolaison ("Nicolaison"), a Minnesota patient in the Minnesota Sex Offender Program ("the Program") at Moose Lake, Minnesota, commenced this action seeking relief for alleged violations of certain federal constitutional rights and state law. In particular, Nicolaison alleged in his Complaint that on January 27, 2003, and again on October 29 and 31, 2003, he was subjected to a visual search of his naked body by Moose Lake Facility Staff. According to Nicolaison, these searches were performed on all of the residents of the Moose Lake Facility and were condoned by defendants Kevin Goodno, the Commissioner of the Minnesota Department of Human Services and defendant Jerry Zimmerman, the Group Supervisor of the Program. Defendants admit that on January 27-29 and again on October 29-31, 2003, Program employees conducted a facility-wide search of patients' rooms and visual body searches of the patients. See Affidavit of Paula A. Johnson ("Johnson Aff."), ¶¶ 16, 20; see also Affidavit of Kevin Goodno ("Goodno Aff."), ¶¶ 4-5; Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs.' Mem.") at p. 4. These body searches were conducted by two male staff members and included a visual check of the patients' mouth, genital and anal areas, however, no inmates were ever touched.

---

[2]      See Complaint, at p. 2, ¶¶ 11-12.

Nicholaison R&Rv3                                              2

<u>See</u> Affidavit of Larry TeBrake ("TeBrake Aff."), ¶ 5.

## II.   Facts Pertaining to the January 2003 Search

In January of 2003, Paula Johnson, the Program's Security Director, received information that a patient in the Program may have been in possession of a cell phone after he received a cell phone bill in the mail.  <u>See</u> Johnson Aff., ¶ 6.  The patient's cell was searched to ensure that he was not in possession of the phone.  <u>Id.</u>  During the search, the patient entered the room, which is not permitted, and touched one of the searchers.  <u>Id.</u>  The patient was asked to leave the room.  <u>Id</u>.  The patient was then seen having a conversation with a second patient in hallway.  <u>Id.</u>  The Program's staff members suspected that the cell phone had been passed from the first patient to the second patient.  <u>Id.</u>, ¶ 7.  Staff members learned that the second patient had opened a plastic tub located outside of his doorway after it had already been searched.  <u>Id.</u>  When staff members searched the storage bin, they discovered a plastic baggie that contained a substance that tested positive for marijuana.  <u>Id.</u>   A cell phone was also discovered inside of the storage bin outside of the second patient's room.  <u>Id</u>.

In addition to this incident, since 1995, the Program has found controlled substances in a patient's possession seven times.  Further, shortly before the January 2003 discovery of marijuana, a patient who had transferred to the Program from the St. Peter's facility, tested positive for Tetradrocannibol ("THC") shortly before his transfer.[3] <u>Id.</u>, ¶ 9.

Due to the recent discovery of marijuana and cell phone, and the suspicion that

---

[3]     THC is isolated from marijuana.  <u>See</u> STEDMAN'S MEDICAL DICTIONARY (2000).

contraband was being transferred patient to patient, Johnson recommended to Rick Harry, the chief operating officer for the Program, and defendant Zimmerman, that a facility-wide search of patient rooms and visual body searches be conducted to detect controlled substances, cell phones or other contraband.  See Johnson Aff., ¶ 15; see also Zimmerman Aff., ¶¶ 2-3; Affidavit of Rick Harry ("Harry Aff."), ¶ 8.  Harry authorized the search because there was reasonable suspicion that patients possessed and were likely to transfer marijuana from patient to patient in order to avoid detection, and that a comprehensive search was needed in order to protect the security of the Program.  See Harry Aff., ¶ 8.  In this regard, defendants stated that the possession of controlled substances by patients constituted a threat to security to the Program for the following reasons:

> Patient use or possession of marijuana presents a major security threat to patient and staff member security.  Patients under the influence of mood-altering, unmonitored chemicals may become out-of-control, more aggressive, and more violent. Program patients are dangerous by definition, and many patients' [sic] criminal history reveals use of mood-altering chemicals during the patient's dangerous behavior or criminal activities. Patient sale or transfer of controlled substances may also result in aggressive or violent exchanges among patients involved in the exchange. An increase in patient aggression or violence could create difficulty for staff members in maintaining a safe and secure environment for all patients and staff members. [4]

See Johnson Aff., ¶ 11; see also Huot Aff., ¶ 7.

---

[4]    In addition, defendants asserted that controlled substances can be a triggering mechanism for reoffense, thereby undermining the treatment of the Program's patients. See Huot Aff., ¶ 7.

Defendants also submitted evidence that possession of cell phones by patients poses a grave security risk for the facility, staff members, and the public. Specifically, cell phones could be used to contact persons outside of the facility, including past victims, the "grooming" of future victims,[5] and directing criminal activities outside of the Program facility. See Huot Aff., ¶ 8; see also Johnson Aff., ¶ 12. In addition, defendants stated that the secret use of cell phones, without any monitoring, provides patients with the means to disrupt their therapy because some phones have photographic and internet capabilities, which allows patient to obtain counter-therapeutic materials or contraband pornography. See Huot Aff., ¶ 8; see also Johnson Aff., ¶ 13. Further, defendants stated that the presence of a cell phone by a patient undermines Program security in that patients could use the phone to plan escapes and compromise secure locations in the facility by taking photographs of the facility. See Huot Aff., ¶ 8; see also Johnson Aff., ¶ 14.

In response, Nicolaison stated "marijuana usage or possession creates no problems at the facility and may be beneficial and helpful to some patient's controlling antisocial behaviors, including sexual assault." See Plaintiff Wayne Nicolaison Affidavit in Support of Motion in Opposition for Summary Judgment ("Nicolaison Aff."), ¶ 7. In addition, Nicolaison asserted that defendants have presented no evidence that possession of cell phone by inmates poses any "grave" danger to the staff, the Program or to the public. See Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Pls. Mem.") at p. 6. In support of this contention, Nicolaison

---

[5]   Some of the patients have a history of using the telephone in order to obtain future victims. See Huot Aff., ¶ 8.

stated that he will "call witnesses to testify that they possessed cell phones for many months without staff knowledge, which evidences that residents should be allowed to possess them freely." Id.

On January 27, 2003, staff members of the Program were notified that a facility wide search of patient rooms and patient searches would begin that morning. See Johnson Aff., ¶ 16. The search teams for the body searches consisted of two male staff members. Id., ¶ 23. Staff members conducting the unclothed searches were instructed as follows:

> The search team was instructed to first ask the patient if he would agree to the unclothed body search. If the patient agreed to the search, the search team escorted the patient to the tub room, which is a large private bathroom located on each unit. Once in the tub room, one of the searchers closed the door for privacy. The search team would stand near the door, about five (5) to eight (8) feet away from the patient who would be standing at the opposite end of the tub. The searchers wore latex or vinyl gloves which were changed after each search. One search team member would instruct the patient on what to do while the other team member would perform a pat search on the patient's clothing.
>
> The search team visually inspected the patient from a distance of about five to eight feet. The search team asked the patient to run his fingers through his hair, especially if the patient had longer hair. The search team then asked the patient to show his armpits, the bottoms of his feet, and spread his fingers. Next the search team asked the patient to open his mouth. The search team then asked the patient to lift his genitals. Finally, the search team asked the patient to turn so his back was facing the searchers, bend over slightly, and spread his buttocks. As soon as all required areas were visually searched, the search team told the patient that he could dress. After the patient had dressed, the search team escorted the patient back to his room.

Nicholaison R&Rv3

> Search team members were instructed not to touch the
> patient during the unclothed body search unless the patient
> exhibited threatening or aggressive behaviors that required
> the search team to physically restrain the patient.

See Johnson Aff., at ¶¶ 24-26.

Defendants' description of the search is consistent with Nicolaison's description of the search of his person. See Complaint, at pp. 3-4, ¶¶ 5-7.

## III.    Facts Pertaining to the October 2003 Searches

In addition to the discovery of a cell phone in January 2003, a short time before October of 2003, cell phones were discovered in the possession of patients of the Program. See Johnson Aff., ¶ 18. Further, on October 28, 2003, a cell phone cover was discovered in the common hallway, an area accessible to many of the patients at Moose Lake. Id., ¶¶ 17-18; see also TeBrake Aff., ¶ 2. The area in question was searched, however, no cell phone was discovered. See Johnson Aff., ¶ 17. Further, staff members could not distinguish from surveillance video who was responsible for dropping the cell phone cover. Id., ¶¶ 17-18; see also TeBrake Aff., ¶ 2. Johnson suspected that the patients may have passed the cell phone and cover among each other in order to conceal it from detection by staff members. Id.

Johnson shared the cell phone cover incident with Larry TeBrake, the interim Site Director for the Program in Moose Lake and recommended to TeBrake that facility-wide room searches and unclothed body searches of patients take place. See TeBraje Aff., ¶ 2; Johnson Aff., ¶ 19. TeBrake authorized Johnson to conduct such a search given that there was reason to believe that a patient was in possession of a cell phone and

because the cell phone could easily be passed among patients.  See TeBrake Aff., ¶ 3; see also Johnson, ¶ 19.

On October 29, 2003, staff members of the Program were notified that a facility-wide search of patient rooms and patient unclothed body searches would begin that morning.  See Johnson Aff., ¶ 20.  The search was conducted in the same manner and the searchers were given the same instructions as those instructions given during the January 27, 2003 search.  See Johnson Aff., at ¶¶ 20, 24-26, Ex. 1; see also TeBrake Aff., ¶ 5.

On October 30, 2003, a patient at Moose Lake told a staff member that the protective isolation unit should be searched for the cell phone, as he had observed a patient in the unit using a cell phone.  Id., ¶ 21.  That same patient had already been caught with a cell phone at the St. Peter site before being transferred to Moose Lake. Id.  The staff members located a cell phone in the patient's possession unit with internet and photographic capabilities.  Id.

## IV.   Facts Pertaining to the Role of Defendants Kevin Goodno and Jerry Zimmerman in this Case.

The only defendants in this case are Kevin Goodno and Jerry Zimmerman.  In his Complaint, Nicolaison alleged that the searches at issue were ordered or condoned by these defendants.  See Complaint at p. 4, ¶ 9.

Goodno is the Commissioner of the Minnesota Department of Human Services and is responsible for overseeing all State operated services, including sex offender treatment services.  See Goodno Aff., ¶¶ 1-2.  Although Goodno became aware of the January and October 2003 facility-wide searches of the Program at Moose Lake,

Minnesota, he did not personally participate in the recommendation or authorization of either search.  Id., ¶¶ 4-6.

As stated previously, Defendant Zimmerman was the Group Supervisor of the Program at all times relevant to this case.  See Zimmerman Aff., ¶ 1.  His primary duties included responsibility for the day-to-day activities at the Program.  Id.  Zimmerman attended the meeting between Johnson and Harry in January of 2003, relating to Johnson's recommendation of a facility-wide search of patient rooms and unclothed body searches of all patients.  Id., ¶ 3.  Zimmerman's role during the searches was performing his regular duties, which included providing overall supervision of staff. Zimmerman did not participate in any patient searches or in the training of staff members with regards to the January and October 2003 searches at issue.  Id., ¶ 4.

Nicolaison has provided this Court with no evidence, through an affidavit or otherwise, to contradict the evidence put forth by defendants as to their personal roles in the searches at issue.[6]

## V.    Summary of Nicolaison's Claims in his Complaint

In his Complaint Nicolaison alleged, pursuant to 42 U.S.C. § 1983, that defendants' unauthorized body search of him violated the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.  Complaint at pp. 5-7, ¶¶ 26-31.  In addition, Nicolaison alleged that defendants violated Minnesota Statutes §§

---

[6]    This Court notes that defendant Goodno did defend the visual body cavity search in a March 10, 2005, response to a complaint by Nicolaison relating to the January 2003 unclothed search.  See Nicolaison Aff., Ex. C.

253B.03, subd. 1-10; and 144.651, subs. 1-32, which deal with patient and resident rights.

Nicolaison's claims for relief from defendants includes that the Court issue the following declaratory judgments: (1) that he, as a civilly committed person has a right to privacy protected under the First Amendment against suspicionless strip searches; (2) that defendants have no statutory authority to subject him to a strip search without a search warrant or at the minimum, reasonable suspicion that his naked body contained either drugs or dangerous weapons; (3) that he and his fellow residents have greater constitutional rights and protections than prisoners or other arrestees; (4) that defendants violated his First and Fourth Amendment rights by subjecting him to unreasonable strip searches without probable cause or reasonable suspicion; (5) that defendants violated his right to due process under the Fifth and Fourteenth Amendments; (6) that he enjoys the same rights as free citizen living in the public secured by the First Amendment and the due process of the Fifth and Fourteenth Amendments; (7) and that defendants violated his Fifth Amendment right, which prohibits Government agents from forcing a citizen to become a witness against himself, by subjecting him to strip searches. See Complaint at p. 7. In addition, Nicolaison has asked for compensatory and punitive monetary damages. Id. at pp. 7-8.[7]

---

[7]     In the Preliminary Statement of his Complaint, Nicolaison stated that he was seeking injunctive relief. See Complaint, at p. 1. However, he did not ask for injunctive relief in the section of his Complaint entitled "Relief Demands." See Complaint, at pp. 7-8.

## DISCUSSION

**I.    Plaintiff's Motion for Judgment**

In Nicolaison's Motion for Judgment, he alleged that he is entitled to judgment on grounds that defendants perjured themselves in their response to his Document Request No. 1 in order to gain a dismissal of this suit, and that the strip searches at issue were improper as a medical director did not authorize them.  Nicolaison also argued that as a committed individual he has the rights of a "free citizen" and that the strip searches were conducted without any probable cause to believe that he possessed contraband.  In a letter to this Court dated September 22, 2004, defendants asked that Nicolaison's motion be summarily denied.

Request No. 1 and defendants' response to this Request are as follows:

> **REQUEST NO. 1:**
>
> Affidavit of Paul Johnson, employee of the Minnesota Treatment Center, 1111 Highway 73, Moose Lake, MN 55757, filed in this Court in regard to a similar lawsuit cited as *Rick McDeid v. Goodno, et al.* [file no., unknown] that Plaintiff understands was filed in motion for dismissal of that suit.  Plaintiff understands that Defendants' employee of this suit, under oath, testified in affidavit that the strip searches were ordered because of some alleged drug overdose at some other facility or hospital.
>
> **RESPONSE:**
>
> No such affidavit has been filed in the federal district court case, *Rick McDeid v. v. State of Minnesota et al.* (Court File No. 04-11).

Nicolaison argued that defendants perjured themselves in their response to Request No. 1 because in an Affidavit submitted by Johnson in the case of <u>Clouthier v. State of Minnesota</u>, Civil File No. 04-144 (PAM/RLE), Johnson represented that in the

late 1990's or early 2000's a patient had overdosed on a controlled substance that had been smuggled into the facility.  Even if this representation was made by Johnson in Clouthier, it would not amount to perjury in this case as Nicolaison's document request only asked for affidavits filed in Rick McDeid, supra.  This Court's review of Johnson's Affidavit filed in Rick McDeid [Docket No. 46] makes no mention of an overdose.  As such, this Court does not find that defendants committed perjury.

Nicolaison also cites to Riggins v. Nevada, 504 U.S. 127, 138 (1992) in support of his contention that a strip search in a medical facility must be based on a medical justification.  However, Riggins makes no finding that strip searches in a medical facility must be based on a medical justification.[8]  This Court also finds that Harry and TeBrake, the individuals in charge of the Moose Lake Facility, during the relevant time periods, had the authority to order a search for contraband.  See Minn. Stat. § 243.55.

For all of these reasons, it is recommended that Nicolaison's Motion for Judgment be denied.

## II.    Defendants' Motion for Summary Judgment

In support of their motion for summary judgment, defendants argued that Nicolaison's suit should be dismissed on the grounds that they are entitled to Eleventh Amendment immunity in their official capacities; that Nicolaison has failed to allege that defendants were affirmatively involved in the alleged violations of his rights; that Nicolaison's various constitutional claims fail on summary judgment; and that to the

---

[8]    Nicolaison's arguments that as a committed individual has the rights of a "free citizen" and that the strip search was conducted without sufficient probable cause will be

extent that this Court found that a genuine issue existed as to whether the individual defendants had engaged in constitutionally impermissible conduct, they are entitled to qualified immunity.

In opposition to defendants' motion for summary judgment, Nicolaison argued that the searches at issue violated his rights under state law and his rights under the United States Constitution.  Further, it Nicolaison's contention that as a civilly committed person, he is entitled to more constitutional protections than those afforded to a prison inmate or pretrial detainee.  Nicolaison also asserted that possession of marijuana and cell phones by patients at Moose Lake creates no danger to the institution and that defendants have not provided any evidence to support that danger.  It is also Nicolaison's position that under Minnesota law, he is entitled to a right of privacy, and that the visual body cavity searches were conducted without reasonable suspicion or probable cause in violation to his constitutional right of privacy.  Finally, Nicolaison argued that defendants are not entitled to qualified immunity because they violated clearly established constitutional rights, as is evidenced by cases finding strip searches of pretrial detainees to be unconstitutional.

A.    Standard of Review

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celeotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,

_____

discussed, <u>infra</u>, in conjunction with defendants motion for summary judgment and Nicolaison's motion to deny defendants' motion for summary judgment.

249-50 (1986); see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999).   "[S]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action."   Celotex, 477 U.S. at 327.   "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"   DePugh v. Smith, 880 F. Supp. 651, 656 (N. D. Iowa 1995) (quoting Anderson, 477 U.S. at 248).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed.   Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).   If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.   Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995).   "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial."   Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 U.S. Dist. LEXIS 11439, *4-5 (D. Minn. 2003) (citations omitted).   The non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy."   Wilson v. Int'l Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995).   If the evidence is

"merely colorable or is not significantly probative, summary judgment may be granted."

<u>Anderson</u>, 477 U.S. at 249-50.

### B. Claims for Monetary Damages Against Defendants In Their Official Capacities

Defendants argued that the Eleventh Amendment to the United States Constitution bars Nicolaison from obtaining monetary damages against them in their official capacities. <u>See</u> Defs.' Mem. at pp. 10-11. The Eleventh Amendment states that the "judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state." Under the Eleventh Amendment, federal courts do not have subject matter jurisdiction over a claim against a state for damages that has not consented to the suit. <u>Seminole Tribe of Florida v. Florida</u>, 517 U.S. 44, 64-65 (1996); <u>Roberts v. Dillon</u>, 15 F.3d 113, 115 (8th Cir. 1994). This immunity extends to state officials as well since "a suit against a state official in his or her official capacity is a suit against the official but rather is a suit against the official's office [and] is no different from a suit against the State itself." <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 71 (1989). When a lawsuit is barred by the Eleventh Amendment, the case must be dismissed for lack of subject matter jurisdiction. <u>Seminole Tribe</u>, 517 U.S. at 64-65.

In his Complaint, Nicolaison has brought suit against the defendants for compensatory and punitive damages, however, the defendants have not consented to such a suit. As such, the Eleventh Amendment bars Nicolaison's claims against defendants in their official capacities and this Court lacks jurisdiction over such claims.

Defendants' motion for summary judgment should be granted as to Nicolaison's damage claims against them in their official capacities.[9]

### C. Claims of Constitutional Violations Against the Individual Defendants In their Individual Capacities

#### 1. First Amendment Claims

Nicolaison claimed that defendants invaded his right to personal privacy under the First Amendment to the United States Constitution because the visual body searches performed on him were done without probable cause or reasonable suspicion. See Complaint at p. 6, ¶ 27. Defendants argued that summary judgment is appropriate because there is no First Amendment right to privacy. See Defs.' Mem. at p. 14.

In opposition to defendants' motion for summary judgment, Nicolaison stated that he is entitled to a "zone of privacy" while under civil commitment and that the strip searches performed on him invaded that zone of privacy, thereby violating his rights under the First Amendment. See Pl.'s Mem. at pp. 9-10. In support of this assertion, Nicolaison cited to several cases, including Tardiff v. Knox County, 365 F.3d 1 (1st Cir. 2004); Wood v. Hancock County Sheriff's Dept., 354 F.3d 57 (1st Cir. 2003); and Goff v.

---

[9] Defendants have not claimed that the Eleventh Amendment bars Nicolaison's requests for declaratory judgments against them. Further, this Court notes that the Eleventh Amendment does not bar Nicolaison's request for declaratory judgment with regards to his constitutional rights. See Dakota, Minnesota & Eastern Railroad Corp., 362 F.3d 512, 517 (8th Cir. 2004) (citation omitted); see also Klinger v. Director, Dept. of Revenue, 281 F.3d 776, 777 (8th Cir. 2002) (per curium). However, as this Court has concluded that Nicolaison has failed to present facts to support a claim of any constitutional violation (see Section II.C.1-7, infra), he is not entitled to declaratory relief on any federal constitutional claim. Further, to the extent that he seeks relief under state law, in light of this Court's recommendation that defendants' motion for summary judgment be granted on his federal claims, this Court has also recommended that the Court decline to take jurisdiction over Nicolaison's state claims. See Section II.E, infra.

Nicholaison R&Rv3

<u>Nix</u>, 803 F.2d 358 (8th Cir. 1986).  <u>Id.</u> at p. 10.  However, none of these cases dealt with

whether the First Amendment provides a right to privacy.

      The First Amendment to the Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const., Amend. I.

      While nothing in the express language of the First Amendment affords a right to

privacy, the Supreme Court has recognized the right of certain zones of privacy under

various Amendments, including the First Amendment:

> The Constitution does not explicitly mention any right of privacy. In a line of decisions, however, going back perhaps as far as <u>Union Pacific R. Co. v. Botsford</u>, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891), the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution. In varying contexts, the Court or individual Justices have, indeed, found at least the roots of that right in the First Amendment, <u>Stanley v. Georgia</u>, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969); in the Fourth and Fifth Amendments, <u>Terry v. Ohio</u>, 392 U.S. 1, 8-9, 88 S.Ct. 1868, 1872-1873, 20 L.Ed.2d 889 (1968), <u>Katz v. United States</u>, 389 U.S. 347, 350, 88 S.Ct. 507, 510, 19 L.Ed.2d 576 (1967); <u>Boyd v. United States</u>, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), <u>see</u> <u>Olmstead v. United States</u>, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting); in the penumbras of the Bill of Rights, <u>Griswold v. Connecticut</u>, 381 U.S., at 484- 485, 85 S.Ct., at 1681-1682; in the Ninth Amendment, id., at 486, 85 S.Ct. at 1682 (Goldberg, J., concurring); or in the concept of liberty guaranteed by the first section of the Fourteenth Amendment, <u>see</u> <u>Meyer v. Nebraska</u>, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). These decisions make it clear that only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,'

>Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152,
>82 L.Ed. 288 (1937), are included in this guarantee of
>personal privacy. They also make it clear that the right has
>some extension to activities relating to marriage, Loving v.
>Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d
>1010 (1967); procreation, Skinner v. Oklahoma, 316 U.S.
>535, 541-542, 62 S.Ct. 1110, 1113-1114, 86 L.Ed. 1655
>(1942); contraception, Eisenstadt v. Baird, 405 U.S., at 453-
>454, 92 S.Ct., at 1038- 1039; *153 id., at 460, 463- 465, 92
>S.Ct. at 1042, 1043-1044 (White, J., concurring in result);
>family relationships, Prince v. Massachusetts, 321 U.S. 158,
>166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); and child
>rearing and education, Pierce v. Society of Sisters, 268 U.S.
>510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925), . . .

See Roe v. Wade, 410 U.S. 113, 152 (1973); see also Griswold v. Connecticut, 381 U.S. 479, 484-85 (1965); Eagle v. Morgan, 88 F.3d 620, 625 (8th Cir. 1996) (providing that the substantive due process safeguards individuals from governmental intrusions into their personal lives) (citation omitted).

However, this Court has found no authority to support a claim to a right to privacy pursuant to the First Amendment based on a claim of an unreasonable search. Therefore, this Court finds that Nicolaison's right to privacy and any alleged intrusion on this right by the visual body searches should be examined under the Fourth Amendment[10], and not the First Amendment. See Schmerber v. California, 384 U.S. 757, 767 (1966) ("The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State."); United States v. Payne, 119 F.3d 637, 644 (8th Cir. 1997) (finding that in the context of a search,

---

[10]    As stated in the next section, the Fourth Amendment gives people the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, . . ." See U.S. Const., Amend. IV (emphasis added).

"Fourth Amendment rights go to the right of privacy and to be left alone. . . .") (citation omitted).[11]    As such, this Court recommends that defendants' motion for summary judgment as it relates to Nicolaison's First Amendment claims be granted.

2.    <u>Fourth Amendment Claims</u>

Nicolaison maintained that the visual body searches to which he was subjected in January and October of 2003, violated the Fourth Amendment prohibition against unreasonable searches.  Specifically, he asserted that these searches were conducted without probable cause or reasonable suspicion that he had drugs or a cell phone hidden on his person.  <u>See</u> Pl.'s Mem. at p. 10; <u>see</u> <u>also</u> Complaint, at p. 5, ¶ 26. Defendants claim that the searches were reasonable for the purposes of the Fourth Amendment.  <u>See</u> Defs.' Mem. at p. 15.

a.    <u>Standard of Reasonableness</u>

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons against  unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. Amend. IV; <u>see</u> <u>also</u> <u>Bell v. Wolfish</u>, 441 U.S. 520, 558 (1979) ("'The Fourth Amendment prohibits only unreasonable searches', . . .") (quoting <u>Carroll v. United States</u>, 267 U.S. 132, 147 (1925)).

Defendants argued that this Court should use the same standard of reasonableness for searches relating to civilly committed individuals, as that which is

---

[11]    <u>See</u> <u>also</u> <u>Griswold</u>, 381 U.S. at 484-85 ("The Fourth and Fifth Amendments were described in <u>Boyd v. United States</u>, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746, as protection against all governmental invasions 'of the sanctity of a man's home and the privacies of life.'  We recently referred in <u>Mapp v. Ohio</u>, 367 U.S. 643, 656, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081, to the Fourth Amendment as creating a 'right to privacy, no less important than any other right carefully and particularly reserved to the people.'").

applied to pretrial detainees.  See Defs.' Mem. at p. 17. Nicolaison disagreed, arguing

that defendants' assertion is based on "erroneous" decisions by district courts and that

these cases did not involve strip searches.  See Pl.'s Mem. at pp. 11-12.

The Eighth Circuit and several courts within the District of Minnesota have

examined the standard under which the constitutional protections of civilly committed

individuals should be examined.  In Andrews v. Neer, 253 F.3d 1052 (8th Cir. 2001), the

Eighth Circuit determined that a civilly committed person's:

> [E]xcessive force claim does not fit neatly into an analysis
> based on the status as an arrestee, a pre-trial detainee, or a
> prisoner.  Bobby Andrews was held in Fulton after having
> been found not guilty of murder by reason of insanity, and
> thus he was not a 'prisoner' subject to punishment . . .  His
> confinement in a state institution raised concerns similar to
> those raised by the housing of pretrial detainees, such as the
> legitimate institutional interest in safety and security of
> guards and other individuals in the facility, order within the
> facility, and the efficiency of the facilities operations . . .
> Accordingly, we conclude that Andrews's excessive force
> claim should be evaluated under the  . . . standard usually
> applied to excessive force claims brought by pretrial
> detainees.

Andrews, 253 F.3d at 1061 (citations omitted).

In Stone v. Harry, Civ. No. 02-0028 (MJD/RLE), aff'd by Stone v. Harry, 364 F.3d

912 (8th Cir. 2004), the district court found that a civilly committed patient is not entitled

to any more protections under Constitution, including the Fourth Amendment, than

those afforded to pretrial detainees.   Id. at pp. 24-27 (Report and Recommendation

adopted by District Judge Michael Davis); see also Meyer v. O'Keefe, No. 03-5251,

2004 WL 2212091 at *3 (D. Minn. Sept. 30, 2004)  (finding that same due process

standard used for pretrial detainees should be applied to a committed sex offender);

DeVellion v. Milczark, Civil No. 01-617 (DWF/SRN) (D. Minn. Nov. 7, 2001) at p. 9 (finding that a civilly committed individual has the same protection, if not less, than a pretrial detainee for the purposes of due process) (Report and Recommendation adopted by District Judge Donovan Frank).

More recently, Magistrate Judge Raymond Erickson addressed the claims of another civilly committed sex offender at the Moose Lake facility relating to the same visual body searches at issue in this case.  Magistrate Judge Erickson concluded that for the purposes of that plaintiff's Fourth Amendment:

> While the Plaintiff is not detained by reason of criminal conviction, he has been lawfully detained by the state of Minnesota.  As such he does not have the status of either a free citizen or a convicted inmate.  Therefore we concur in the view that his position is most analogous to that of a pretrial detainee, since his unlawful detention raises concern about institutional safety, order and efficiency.

Clouthier v. State of Minnesota, Civ. No. 04-144 (PAM/RLE) (D. Minn. January 10, 2005) at p. 20 (citation omitted) (Report and Recommendation adopted by District Jude Paul Magnuson in Order dated February 4, 2005).

This Court concurs with the decisions in Andrews, Clouthier, Stone, Meyer and DeVillion, that a civilly committed person's status, for the purpose of determining his constitutional rights, is the same as that afforded to a pretrial detainee.[12]  As such, this

---

[12]    As stated previously, Nicolaison asserted that as a civilly committed individual, he is entitled to the same constitutional rights as free citizens.  See Complaint, at p. 7, ¶ 5; see also Pl.'s Mem. at p. 7.  This Court rejects this contention.  Although persons who have been involuntarily committed are entitled to more considerate treatment and conditions than criminals, the rights of civilly committed person must be balanced against the interests of the state.  See Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982).  As stated previously, "confinement in a state institution raised concerns similar to those raised by the housing of pretrial detainees, such as the legitimate institutional

Court will examine the remainder of Nicolaison's constitutional claims, including his unreasonable search claim under the Fourth Amendment, under the standards as applied to pretrial detainees.

b.    Validity of Visual Body Searches

The United States Supreme Court in <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979) examined the propriety of visual body cavity searches of pretrial detainees and prisoners.  In <u>Bell</u>, all detainees were required to expose their body cavities for a visual inspection as part of a strip search conducted after every contact visit with a person from outside of the facility.  <u>Id.</u> at 558.[13]  The detainees were not to be touched at any time during the visual search procedure.  <u>Id.</u>  The district court upheld the strip-search procedure, but prohibited the body cavity searches absent probable cause to believe that the individual inmate was concealing contraband.  <u>Id.</u> at 558.  The Court of Appeals affirmed the decision of the district court.

The Supreme Court in <u>Bell</u> reversed the Court of Appeals, finding that in determining whether a search is reasonable for Fourth Amendment purposes, the need of the search is balanced against the invasion of personal rights that the search entails, and this balancing requires a Court to examine the scope of the search, the manner it

---

interest in the safety and security of guards and other individuals in the facility, order within the facility, and the efficiency of the facility's operations."  <u>Andrews</u>, 253 F.3d at 1061.  As a civil committed person, Nicolaison's constitutional rights are not absolute and can be subject to reasonable limitation or retraction based on security concerns. <u>See</u> <u>Nicolaison v. Milczark</u>, 26 Fed. Appx. 596, 2002 WL 15669 at *1 (8th Cir. 2002).

[13]    The search policy at issue in <u>Bell</u> required a male inmate to lift his genitals and bend over to spread his buttocks for visual inspection and for female inmates, the vaginal and anal cavities were visually inspected.  <u>Id.</u> at 558, n. 39.

was conducted, the justification for the search, and the place it was conducted. Id. at 559 (string citation omitted). The Supreme Court recognized that "a detention facility is a unique place fraught with serious security dangers. Smuggling of money drugs, weapons, and other contraband is an all too common an occurrence." Id. The Court also noted that concealing of contraband on an inmate's bodies also occurs. Id. (citations omitted). The Court, in balancing the "significant and legitimate security interests" of a detention facility with the "privacy interests of the inmates", concluded that visual body cavity searches can be conducted on less than probable cause. Id. at 560.

Notwithstanding the Supreme Court's holding in Bell, Nicolaison argues that John Does 1-100 v. Ninneman, 612 F. Supp. 1069 (D. Minn. 1985), dictates that the visual body searches at Moose Lake violated his rights under the Fourth Amendment. See Pl.'s Mem. at p. 12. In John Does 1-100, defendants required that all pretrial detainees who were placed in the general jail population, submit to a complete unclothed visual search including the rectal and genital areas. Id. at 1070. The defendants contended that the indiscriminate nature of the strip search policy was justified as the most effective means of detecting drugs, weapons and other contraband. Id.

The district court conducted a balancing test under Bell and found that the defendants violated the Fourth Amendment rights of the plaintiffs who were strip searched after they were arrested for driving after revocation and for failure to appear at a hearing related to child support. In reaching this conclusion, the court noted that the defendants failed to show that the plaintiffs, or similar pretrial detainees, constituted a real security risk ("arrested on minor offenses unrelated to drugs, weapons or predatory

conduct"), that no reasonable suspicion existed that these plaintiffs harbored contraband on their bodies, and that the "unanticipated nature of their detention" belied "the rationality of the county's asserted deterrent effect of strip searching."  Id. at 1071 (citation omitted).  The court further held that "[j]ail officials must articulate specific objective facts and rational inferences to be drawn therefrom, and suspicion must be individualized—'directed to the person who is targeted for the strip search'--to justify a search of such scope.'"  Id. at 1072 (quoting Hunter v. Auger, 672 F.2d 668, 674-75 (8th Cir. 1982)) (dealing with strip searches of prison visitors).

This Court finds that the facts in this case are distinguishable from those found in John Does 1-100.  First, in this case, the visual body searches were conducted in response to discoveries of contraband in the facility.  Second, Moose Lake Program is a secured facility "for individuals who have been civilly committed as sexual psychopathic personalities and/or sexually dangerous persons."[14]  See Huot Aff., ¶ 4.  As such, the

---

[14]    "Sexual psychopathic personality" is defined under Minnesota law as:

> the existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any of these conditions, which render the person irresponsible for personal conduct with respect to sexual matters, if the person has evidenced, by a habitual course of misconduct in sexual matters, an utter lack of power to control the person's sexual impulses and, as a result, is dangerous to other persons.

See Minn. Stat. § 253B.02, subd. 18b.

A "sexually dangerous person" is defined as:

patients in the Program, unlike those in John Does 1-100, do constitute a security risk to the patients, staff members and the public.

Third, the Eighth Circuit has recognized that "[a]lthough an involuntary committed person at a state hospital is not a prisoner per se, his confinement is subject to the same safety and security concerns as that of a prisoner."  Revels v. Vincenz, 382 F.3d 870, 874 (8th Cir. 2004) (citing Andrews, 253 F. 3d at 1061) (holding that an excessive-force claim from any involuntarily committed state hospital patient should be evaluated under the same standard as an excessive-force claim brought by a pretrial detainee.  It is for this reason, this Court finds the decisions in  Goff v. Nix, 803 F.2d 358 (8th Cir.1986), cert. denied, 484 U.S. 835 (1987) and Franklin v. Lockhart, 883 F.2d 654 (8th Cir. 1989), cases involving visual body searches of prisoners, instructive.  In Goff, the Eighth Circuit applied the Bell balancing test in upholding the constitutionality of visual body cavity searches performed on state inmates in a state prison.  The prison officials in Goff implemented a policy of visual body cavity searches of all inmates "when an inmate enters or leaves the institution or the cellhouse if the inmate is in one of the segregation units, before and after contact visits or after exposure to general population inmates if the inmate is in a segregation unit, and any other time when there is a reasonable suspicion that an inmate is concealing contraband in a body cavity."  Goff, 803 F.2d at 360.  In applying the Bell balancing test, the Eighth Circuit recognized the

---

a person who "has engaged in a course of harmful sexual conduct," has "manifested a sexual, personality, or other mental disorder or dysfunction"; and as a result, is likely to engage in acts of harmful sexual conduct . . ."

Id., subd. 18c.

discretion given prison administrators, and that the security concerns of administrators outweighed the intrusion of the inmates' personal rights resulting from the visual body cavity searches.  See Goff, 803 F.2d at 366.  The Eighth Circuit also recognized and expressed agreement with two lines of cases addressing the validity of visual body cavity searches: (1) those cases finding that visual body cavity searches of those charged with traffic offenses or misdemeanors are unreasonable, unless "reasonable suspicion" exists; and (2) those cases involving visual body cavity searches of persons who already have been convicted and who are incarcerated in facilities or who are pretrial detainees charged with felonies, which did not warrant the same level of constitutional protections under the Fourth Amendment.  Id. at 370 (citations omitted).

Similarly, in Franklin, the plaintiffs challenged a prison policy that required visual body cavity searches, similar to those in this case, of inmates in segregation for punitive purposes, inmates housed in administrative segregation, and those inmates requiring protective custody.  883 F.2d at 655.  The reason espoused by prison officials for the visual body cavity searches was these inmates were the most dangerous of all inmates and that contraband, including a homemade knife and a shotgun shell, had been discovered.  Id.  The Eighth Circuit, in upholding the visual body cavity searches under the Bell balancing test, stated:

> [W]e hold that the searches as conducted at the Cummins Unit violate neither the eighth nor the fourth amendment when viewed in the light of Wolfish and Goff . . . Our holding is, of course, limited to the facts established in this case and should not be read to constitute a carte blanche approval of all VBC searches. Where there is no substantial evidence that the manner of the search is an 'exaggerated . . . response to the perceived security concerns,' however, we

must give wide-ranging deference to prison officials on
matters concerning institutional security.

Id. at 657 (quoting Goff, 803 F.2d at 362-63).

Based upon this authority, this Court finds that under the standards articulated in

Bell, the visual body cavity searches of Nicolaison did not violate the Fourth

Amendment.  First, defendants presented legitimate reasons for each search.  The

visual body search in January of 2003 was prompted by a patient of the program at St.

Peter's testing positive for marijuana shortly before being transferred to the Moose Lake

facility, and the discovery of marijuana and cell phone in a storage bin at Moose Lake.

See Johnson Aff., ¶¶ 7, 9.  Further, the Program has history of controlled substances

being smuggled into the facility and that searches have discovered such contraband.

See Harry Aff., ¶ 8; see also Johnson Aff., ¶ 9.[15]

The October 2003 search was based on the discovery of a cell phone cover in an

area of the Moose Lake facility that was accessible by all patients.  See Johnson Aff., ¶

17.  In addition, there was a history of patients being in possession of cell phones in the

facility.  Id., ¶ 18.  Even Nicolaison stated that he would "call witnesses to testify that

they possessed cell phones for many months without staff knowledge."  See Pl.'s Mem.

at p. 6.  Defendants also presented evidence that in the past, patients have passed

contraband in order to avoid detection.  See Johnson Aff., ¶ 17.

Second, defendants articulated legitimate interests for keeping mind-altering

narcotics, such as marijuana, away from persons who have been civilly committed as

---

[15]    This Court notes that the Program has continued to find cell phones, including at
least one with a homemade internet cable hook-up device, and drugs.  See Johnson
Aff., ¶ 28.

sexual psychopathic personalities or sexually dangerous persons, and for getting cell phones, some with cameras and internet access, out of the hands of civilly committed sex offenders in order to ensure the safety of the public and the safety of staff.[16]  See Huot Aff., ¶ 8.

Third, while visual body searches, by their very nature, are a highly intrusive procedure, this Court finds that a separate visual search of each patient in a private bathroom, with no touching, was reasonable in scope, manner and location.

In sum, this Court finds that given the immediate and past presence of contraband at the Moose Lake facility prior to the visual body searches, the legitimate interests of the Program in protecting patients, staff, and the public from exposure to

---

[16]    Nicolaison claims in his motion for judgment and his summary judgment opposition papers that he has a right under Minn. Stat. § 144.651, dealing with the rights of patients and residents of health care facilities, and Minn. Stat. § 253B.03, dealing with the rights of civilly committed patients, to make and take private telephone calls.  As a starting point, this Court finds that it is Minn. Stat. § 253B.03, as opposed to § 144.651, that applies to Nicolaison as a civilly committed patient.  Further, this Court finds that the plain language of § 253B.03 does not give civilly committed patients the right to unfettered private telephone access:

> Visitors and phone calls. Subject to the general rules of the treatment facility, a patient has the right to receive visitors and make phone calls. The head of the treatment facility may restrict visits and phone calls on determining that the medical welfare of the patient requires it. Any limitation imposed on the exercise of the patient's visitation and phone call rights and the reason for it shall be made a part of the clinical record of the patient.

Minn. Stat. § 253B.03, subd. 3.

    As stated previously, Program patients are prohibited from possessing cell phones.  See Huot Aff., ¶ 6.

and use of controlled substances and cell phones, and the scope, manner and location of the searches, the visual body searches of Nicolaison were reasonable for the purposes of the Fourth Amendment.[17]  See Clouthier v. State of Minnesota, Civ. No. 04-144 (PAM/RLE) at p. 24 (upholding the visual body cavity searches conducted in this case as not violative of the Fourth Amendment); see also Brown v. State of Minnesota, Civ. No. 04-193 (JRT/AJB) at pp. 8-10 (also finding that the visual body cavity searches conducted in this case were not violative of the Fourth Amendment) (Report and Recommendation adopted by District Judge John Tunheim in Order dated May 3, 2005); Jack v. State of Minnesota, Civ. No. 04-106 (JNE/AJB) at pp. 8-10 (same) (Report and Recommendation adopted by District Judge Joan Ericksen in Order dated May 6, 2005).   On this basis, this Court recommends that defendants be granted summary judgment on Nicolaison's Fourth Amendment claims.

       3.    Eighth Amendment Claims

Nicolaison claimed that defendants violated the Eighth Amendment as the visual body searches constituted cruel and unusual punishment.  See Complaint at p. 6, ¶ 29. Defendants argued that Nicolaison's Eighth Amendment claim should be dismissed because the Eighth Amendment's prohibition only applies to punishment imposed for the conviction of a crime.  See Defs.' Mem. at p. 15.

---

[17]      Nicolaison also noted that defendants have not provided evidence that any contraband was found during the strip searches.    See Pl.'s Mem. at pp. 10-11. However, a lack of discovery of contraband on the inmates may be more a testament to the effectiveness of this search as a deterrent rather than to any lack of interest on the part of the inmates to carry contraband on their persons when the opportunity and need arises.  See Bell, 441 U.S. at 559.

"After incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Whitley v. Albers, 475 U.S. 312, 319 (1986).  Because Nicolaison was a civilly committed patient, his claim does not directly implicate the Eighth Amendment proscriptions against cruel and unusual punishment; rather, it is a due process claim. See Youngberg v. Romeo, 457 U.S. 307, 316-317 (1982) (the Supreme Court analyzed the rights of an involuntarily confined individual under the Due Process Clause, rather than under the Eighth Amendment); see also Ingraham v. Wright, 430 U.S. 651, 671, n. 40 (1977) (finding that the Eighth Amendment's protections do not attach until after conviction); Revels, 382 F.3d at 874 (citations omitted) ("because an involuntarily committed psychiatric patient is confined for treatment rather than incarcerated for the purpose of punishment following conviction, the Eighth Amendment does not apply.").

There is no dispute that Nicolaison is presently civilly committed as opposed to being incarcerated for the commission of a crime.  Therefore, the Eighth Amendment protections do not apply to him and defendants' motion for summary judgment on those claims in his Complaint arising under Eighth Amendment should be granted.

### 4.    Procedural Due Process Claims

Nicolaison maintained that defendants violated his right to due process under the Fifth and Fourteenth Amendments.  See Complaint, at p. 6, ¶ 28.  An individual who has been involuntarily committed may not be punished without adequate due process.  See Meyer, 2004 WL 2212091 at *3 (citation omitted).  However, "[i]f a particular condition of pretrial condition or restriction of pretrial detention is reasonably related to a legitimate

governmental objective, it does not, without more, amount to punishment," and no due process considerations are triggered. Smith v. Copeland, 87 F.3d 265, 268 (8th Cir. 1996); see also Meyer, 2004 WL 2212091 at *3 (applying the same standard to civilly committed individuals).

As stated in Section II.C.2.b of this Report and Recommendation, this Court finds that the January and October 2003 visual body cavity searches were done for the legitimate government interest of keeping drugs and cell phones out of the hands of committed sexual offenders in order to protect patients, staff, and the public. Consequently, visual body cavity searches, conducted in the institutional setting for the purpose of discovering contraband reasonably believed to be on the premises, does not constitute punishment so as to give rise to a claim under the due process clause. See generally, Goff, 803 F.2d at 371 (finding no violation of the due process clause as result of a policy of strip searches of prisoners). Defendants' motion for summary judgment should be granted as to Nicolaison's due process claims under the Fifth and Fourteenth Amendments.

### 5.    Substantive Due Process Claims

It is also Nicolaison's position that the visual body, constituted unjustified intrusions on his personal security, thereby violating the protections of substantive due process. See Complaint, at p. 6, ¶ 28; see also Pl.'s Mem. at p. 13. Substantive due process "'bar[s] certain government actions regardless of the fairness of the procedures used to implement them, * * * [and thereby] serves to prevent governmental power from being 'used for purposes of oppression.'" Fitzgerald v. Williamson, 787 F.2d 403, 407 (8th Cir. 1986) (quoting Daniels v. Williams, 106 S.Ct. 662, 665 (1986), quoting Murray's

Nicholaison R&Rv3

Lessee v. Hoboken Land & Improvement Co., 18 How. 272, 277, 59 U.S. 272, 277, 15
L.Ed. 372 (1856)).

Nicolaison's substantive due process claim is governed by the Supreme Court's
decision in Youngberg, supra, which involved an involuntary commitment.  There, the
Supreme Court held "[i]n determining whether a substantive right protected by the Due
Process Clause has been violated, it is necessary to balance the liberty of the individual
against the relevant interests of the state."  457 U.S. at 321.  The test set forth by
Youngberg, provides that 'the Constitution only requires that the courts make certain
that professional judgment in fact was exercised. It is not appropriate for the courts to
specify which of several professionally acceptable choices should have been made."  Id.
(citation omitted).  According to the Supreme Court, the due process clause protects
against "arbitrary" action of the Government, which in terms of substantive due process
pertains to "the exercise of power without any reasonable justification in the service of a
legitimate governmental objective, . . ."  County of Sacramento v. Lewis, 523 U.S. 833,
845-46 (1998) (citing Daniels v. Williams, 474 U.S. 327, 331 (1987)).  "[O]nly the most
egregious official conduct can be said to be arbitrary in the constitutional sense, . . ."  Id.
at 846 (quotations omitted).

This Court does not find that the visual body cavity searches violated
Nicolaison's right to personal security afforded by substantive due process.  The
January and October 2003 visual body cavity searches were conducted based on
evidence that contraband, including drugs and cell phones were on the premises and
were being passed between patients.  In addition, the Moose Lake Program had a

legitimate governmental interest of keeping drugs and cell phone out of the hands of committed sexual offenders in order to protect patients, staff, and the public. The Program officials did not conduct the visual body cavity searches on a whim, but were genuinely concerned that contraband was being passed between patients. This Court finds that the actions of defendants (who were acting with a legitimate governmental interest), were not arbitrary and therefore, their Motion for Summary Judgment as it relates to Nicolaison's substantive due process claims should be granted.

### 6.    Fifth Amendment Claim-Double Jeopardy

The Double Jeopardy Clause provides: "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. Amend. V. Although generally understood to preclude a second prosecution for the same offense, the Supreme Court has also interpreted this prohibition to prevent the government from "punishing twice, or attempting a second time to punish criminally, for the same offense." Witte v. United States, 515 U.S. 389, 396 (1995).

Nicolaison claimed that the strip searches violated his rights under the Fifth Amendment to be free from "cruel and unusual punishments for past criminal convictions and sentencing." See Complaint at p. 1, ¶ 6. Nicolaison's claim must fail as a matter of law, as his commitment to the Moose Lake Program does not constitute punishment. See Kansas v. Hendricks, 521 U.S. 346, 369 (1997). As such, civil commitment of sex offenders for treatment cannot constitute a violation of double jeopardy. Further, since Nicolaison's civil commitment does not constitute punishment for purposes of double jeopardy analysis, the implementation of visual body searches while committed, cannot constitute a second punishment for the same act. Cf., Garrity

v. Fiedler, 41 F.3d 1150, 1151-52 (7th Cir. 1994) (prison discipline, does not constitute
"punishment" or "prosecution" for double jeopardy purposes).

　　For all these reasons, summary judgment on Nicolaison's double jeopardy claim
under the Fifth Amendment should be granted.

### 7.    Equal Protection Claim

　　The Program at Moose Lake provides treatment to psychopathic personalities,
sexual psychopathic personalities, and sexually dangerous persons.  See Defs.' Mem.
at p. 2.  Defendants have stated that all patients at the Moose Lake facility who were
sexual psychopathic personalities ("SPP") or sexually dangerous persons ("SDP") were
subjected to the strip searches.  See Tebrake Aff., ¶¶ 2-3; Harry Aff., ¶ 8.  Nevertheless,
Nicolaison claimed that his right to equal protection of the law was violated by the strip
searches at issue, based on his claim that other health care facilities in the state of
Minnesota do not subject their patients to strip searches.  See Complaint, at p. 6, ¶¶ 30-
31.

　　Nicolaison also argued in his opposition memorandum that psychopathic
personalities must be treated equally to the mentally ill and dangerous.  As best as this
Court can discern from this argument, Nicolaison appears to be claiming that his equal
protection rights were violated because sex offenders are subjected to strip searches
when mentally ill and dangerous patients housed in other state medical facilities are not.

　　As a preliminary matter, this Court notes that Nicolaison has presented no
evidence to support his argument that strip searches did not occur at other facilities,
except for his assertion that he was not strip searched while he was a patient in the St.

Peter facility.  Id., ¶ 30.  Thus, summary judgment should be granted on his equal protection claim for failure to present facts to support his conclusory legal arguments. See Wilson v. Int'l Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995) (The non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy.); Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 U.S. Dist. LEXIS 11439, *4-5 (D. Minn. 2003) (citations omitted) ("The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.")

However, even if Nicolaison had presented facts to support his equal protection claim, it would fail.  The Fourteenth Amendment provides in relevant part that no state shall "deny any person with its jurisdiction the equal protection of law."  U.S. Const. amend. XIV.  In order to succeed on an equal protection claim, a claimant must prove that he has been treated differently from other similarly situated individuals, either by operation of a state law or regulation, or by a decision by a state official.  See Bogren v. Minnesota, 236 F.3d 399, 408 (8th Cir. 2000) ("In general, the Equal Protection Clause requires that state actors treat similarly situated people alike"), cert denied, 534 U.S. 816 (2001) (citing Klinger v. Department of Corrections, 31 F.3d 727, 731 (8th Cir. 1994), cert. denied, 513 U.S. 1185 (1995)).  In the present case, this Court finds that "[p]ersons involuntary committed as mentally ill pursuant to  Minn. Stat. § 253B.02, subds. 18(b) and 18(c) (2002), are not similarly situated to those individuals involuntarily committed as SDP or SPP under Minn. Stat. § 253B.02, subds. 18(b) and 18(c) (2002), because the statutory criteria for the respective commitments are fundamentally

different." McDeid v. O'Keefe, No. C0-03-177, 2003 WL 21525128 at *5 (Minn. Ct. App. Jul. 8, 2003).

Further, under the "rational basis" standard,[18] it is not enough for Nicolaison to show that he has been treated differently from others who are similarly situated; he must also show that there is no rational basis for the dissimilar treatment he received. See Costello v. Mitchell Public School District 79, 266 F.3d 916, 921 (8th Cir. 2001) ("A plaintiff may bring an equal protection claim . . . where she alleges 'that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment'") (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam)) (emphasis added); see also Hosna v. Groose, 80 F.3d 298, 304 (8th Cir. 1996) ("To prevail in their claims, the Inmates must prove that '(1) persons who are similarly situated are treated differently by the government, and (2) [that] the government [has failed] to provide a rational basis for the dissimilar

---

[18]    Nicolaison does not claim to be a member of any "suspect classification", nor does he claim that there is a "fundamental liberty interest" at stake. Thus, his equal protection claim is properly analyzed under the "rational basis" standard rather than the more rigorous "strict scrutiny" standard. See Gavin v. Branstad, 122 F.3d 1081, 1090 (8th Cir. 1997) ("Because neither a fundamental right nor a suspect classification is at issue here, we apply rational basis review"), cert. denied, 524 U.S. 955 (1998); Phillips v. Norris, 320 F.3d 844, 848 (8th Cir. 2003) (because prisoner "does not allege he was a member of a protected class or that a fundamental right was violated, he must show that 'similarly situated classes of inmates are treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest'"), quoting Weiler, 137 F.3d at 1051; United States v. LeMay, 260 F.3d 1018, 1030 (9th Cir. 2001), cert. denied, 534 U.S. 1166 (2002) (finding that sex offenders are not a suspect class for the purposes of equal protection analysis); Roe v. Marcotte, 193 F.3d 72, 82 (2nd Cir. 1999) (sex offenders are not a suspect class for purposes of Fourteenth Amendment analysis); Mahfouz v. Lockhart, 826 F.2d 791, 794 (8th Cir. 1987) ("The state's decision to distinguish sex offenders as a group from other inmates and exclude them from the

treatment'"), <u>cert</u>. <u>denied</u>, 519 U.S. 860 (1996), (quoting <u>Moreland v. United States</u>, 968 F.2d 655, 660 (8th Cir.) (<u>en</u> <u>banc</u>), <u>cert</u>. <u>denied</u>, 506 U.S. 1028 (1992)).

Here, the decision to treat sexual psychopathic personalities or sexually dangerous persons differently from patients in other state medical facilities, by subjecting them to visual body cavity searches in order to recover contraband, is rationally related to the legitimate government purposes of preventing sex crimes and maintaining Program security. Having failed to establish that there was <u>no rational basis</u> for defendants' actions, Nicolaison's equal protection claim fails.

For all the above reasons, defendants' motion for summary judgment as it relates to Nicolaison's Equal Protection claim under the Fourteenth Amendment should be granted.

### D.    Qualified Immunity

Having determined that the visual body searches to which Nicolaison was subjected do not amount to a constitutional violation, summary judgment is also appropriate because defendants are entitled to qualified immunity. However, even if Nicolaison could have established that defendants' conduct amounted to a constitutional violation, the doctrine of the qualified immunity would still require summary judgment on Nicolaison's claims.

"'Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

---

work release program is rationally related to the legitimate government purpose of preventing sex crimes and thus does not violate the equal protection clause.").

known.'" Winters v. Adams, 254 F.3d 758, 766 (8th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "The doctrine 'gives ample room for mistaken judgments but does not protect the plainly incompetent or those who knowingly violate the law.'" Bagby v. Brondhaver, 98 F.3d 1096, 1098 (8th Cir. 1996) (quoting Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995); Malley v. Briggs, 475 U.S. 335 (1986)); see also Saucier v. Katz, 533 U.S. 194, 205 (2001) (stating that "[i]f the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense"). "This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." Hunter v. Bryant, 502 U.S. 224, 229 (1991) (quoting Davis v. Scherer, 468 U.S. 183, 195 (1984)). "The obvious function of the qualified immunity rule is to excuse an officer who makes a reasonable mistake in the exercise of his official duties." Edwards v. Baer, 863 F.2d 606, 607 (8th Cir. 1988).

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in the light of the legal rules that were 'clearly established' at the time it was taken." Wilson v. Layne, 526 U.S. 603, 614 (1999) (quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987)). "The lynchpin of qualified immunity is the public official's objective reasonableness." Bagby, 98 F.3d at 1098 (emphasis in original).

The applicability of the qualified immunity doctrine is a question of law and, when qualified immunity is raised as a defense, courts analyze the application of qualified

immunity by addressing the following three determinations:  (1) whether the officials' conduct violates a clearly established statutory or constitutional right;  (2) whether the officials knew or should have known that the right was clearly established; and (3) whether the officials knew or should have known that their conduct violated that right. See Tyler v. Barton, 901 F.2d 689, 691 (8th Cir. 1990) (applying these three factors to prison officials).

In order to overcome the claim of qualified immunity, Nicolaison must show that his constitutional rights were clearly established.  See Treats v. Morgan, 308 F.3d 868, 874 (8th Cir. 2002).  "A right is clearly established if its contours are sufficiently clear that a reasonable official would have fair warning of what type of action would violate that right."  Id. (citing Hope v. Pelzer, 536 U.S. 730, 739-40 (2002)).

As stated previously, this Court found that the visual body searches at issue did not violate Nicolaison's constitutional rights.  Further, this Court could not find, nor did Nicolaison point to, any cases prohibiting visual body searches of civilly committed individuals, under any set of facts, much less facts similar to those presented here. Thus, there are no facts before this Court to suggest that defendants Goodno and Zimmerman could have known or should have known that the searches at issue were a violation of Nicolaison's constitutional rights.[19]   On this basis, summary judgment in favor of defendants should be granted.

---

[19]    Defendant Goodno did not even learn about the searches until after they occurred.  See Goodno Aff., ¶¶ 4-6.

**E.    State Claims**

Nicolaison asserted in his Complaint that the visual body searches violated his rights under Minn. Stat. §§ 144.651; 253B.03.  See Complaint, at p. 2, ¶¶ 11-12.  To the extent that Nicolaison is asserting that these state claims support his § 1983 cause of action, Nicolaison's § 1983 claims should be dismissed, as he cannot seek relief in federal court under § 1983 based on alleged violations of Minnesota laws or correctional policies.  See Nicolaison v. Milczark, 26 Fed. Appx. 596, No. 01-3084. 2002 WL 15669 at *1 (8th Cir. 2002) (citing Marler v. Mo. State Bd. of Optometry, 102 F.3d 1453, 1457 (8th Cir. 1996); Treleven v. Univ. of Minn., 73 F.3d 816, 819 & n. 4 (8th Cir. 1996)); see also Schwindling v. Smith, 777 F.2d 431, 433 (8th Cir. 1985).  This is because "a violation of state law, without more, does not state a claim under the federal Constitution or 42 U.S.C. § 1983."  Marler v. Mo. State Bd. of Optometry, 102 F.3d 1453, 1457 (8th Cir.1996) (citation omitted).  Therefore, Nicolaison's claims under these state laws should be dismissed for failure to state a claim for relief under § 1983.

Further, because summary judgment on all of Nicolaison's federal claims should be granted, the Court should also decline to exercise supplemental jurisdiction over these possible state law claims.  See Russell v. Hennepin County, No. 03-4889 (PAM/RLE), 2004 WL 2370681 at *3 (D. Minn. Oct. 08, 2004) (citing 28 U.S.C. § 1367(c)(3)).  The Court recommends that Nicolaison's state law claims be dismissed without prejudice.

## RECOMMENDATION

For the reasons set forth above and based on all the files, records, and

proceedings herein, IT IS RECOMMENDED that:

1.      Plaintiff's Motion for Judgment [Docket No. 18] be **DENIED**;

2.      Defendants' Motion for Summary Judgment [Docket No. 22] be **GRANTED**;

3.      Plaintiff's Motion to Deny Defendants' Motion for Summary Judgment [Docket No. 32] be **DENIED**; and

4.      The Court further recommends that plaintiff's Complaint be dismissed with prejudice, except for independent state law claims contained within the Complaint, which should be dismissed without prejudice.[20]

Dated:          June 29, 2005

s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

        Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before **July 18, 2005** a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.

---

[20]     See Complaint, at p. 2, ¶¶ 11-12.

Nicholaison R&Rv3

41